Elizalde & Co., Ltd. v. Commissioner.
Elizalde & Co. v. Commissioner
Docket No. 68.
United States Tax Court
1948 Tax Ct. Memo LEXIS 79; 7 T.C.M. (CCH) 706; T.C.M. (RIA) 48200; September 30, 1948
Martin Taylor, Esq., 63 Wall St., New York, N. Y., for the petitioner. Ellyne Strickland, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves Federal income taxes and excess-profits taxes for the years 1936 to 1939, inclusive, deficiencies having been determined against petitioner for these years in the following amounts: Excess-Profits
Year
Income Tax
Tax
1936
$ 7,724.02
$1,470.39
1937
6,568.06
137.49
1938
11,735.13
4,587.99
1939
4,133.74
2,966.80
$30,160.95
$9,162.67
These deficiencies have been determined, in part, because of the inclusion of the following amounts in income of the petitioner, i.e., $26,517.64 for 1936; $23,257.15 for 1937; $61,462.15 for 1938 and $25,346.15 for 1939. The Commissioner *80 in his deficiency notice gave the following reason for including these amounts in petitioner's income: "Net income reported by you on your return was computed by deducting freight on commodities purchased f.o.b. ports in the Philippine Islands at Pacific conference rates. Elizalde & Co., Inc., Manila Philippine Islands, received from the carrier of said freight, freight rebates in the amount of $26,517.64. Net income reported by you has been adjusted pursuant to Section 45 of the Revenue Act of 1936 on account of the aforesaid amounts in order to clearly reflect your income and prevent the evasion of taxes. *" Other adjustments included in the deficiency notice are not contested. The only question we have for determination is whether the respondent erred in including this income in petitioner's taxable income by reason of his proposed adjustment pursuant to section 45 of the Revenue Act of 1936 and like provisions in the Revenue *81 Act of 1938 and the Internal Revenue Code. From evidence, both documentary and oral, we make the following Findings of Fact Petitioner is a Delaware corporation, incorporated in 1935, with its principal office and place of business in New York City and engaged primarily in the business of importing sugar from the Philippine Islands. Elizalde & Co., Inc. (hereinafter sometimes referred to as Elizalde Co.) is a Philippine corporation, organized in 1935, engaged in the shipping and private banking business and in exporting sugar, iron ore, lumber and other commodities. The business of Elizalde Co. developed from a partnership established in the Philippine Islands in 1854 as ship chandlers and dealers in supplies for ships, being originally known as Ynchausti & Co. Starting as a general partnership it entered the shipping business prior to 1898 and also ran a sort of private bank, taking money for deposit, paying interest and providing investments for its depositors. Prior to 1935 Ynchausti & Co. had offices in New York City and San Francisco. Among its employees in the New York office were Fernando de la Guardia, who had worked for the partnership since 1927, his brother, *82 Bernardo de la Guardia, and Julia Jonick. Petitioner took over all the assets of Ynchausti & Co. in the United States, at the time it was organized in 1935, and issued its stock in payment therefor. Petitioner was organized to broaden the activities which had formerly been carried on by the partnership and specifically to engage in the importation of sugar. Prior to the incorporation of the petitioner sugar was not sold by the partnership in the United States except through sugar brokers. Fernando de la Guardia was manager of the New York branch of the partnership prior to 1935 and has been president of the petitioner since the date of its incorporation. The president, Fernando de la Guardia, the vice-president and treasurer, Bernardo de la Guardia, and the secretary, Julia Jonick, made up the board of directors of the petitioner during the years 1936 to 1939, inclusive. They were considered competent officers to run the petitioner's business as it was being enlarged and they continued the work they had been carrying on for the partnership prior to the incorporation of the petitioner. They were given an opportunity to purchase stock and to take a more active interest in the affairs *83 of the petitioner than they had been able to exercise as employees of the partnership. The petitioner has only one class of capital stock issued and outstanding, namely, 222 shares of common stock. Inasmuch as the assets taken over by the petitioner had previously belonged to Elizalde Co. the stock issued by the petitioner in payment of these assets belonged to Elizalde Co. Prior to 1938 this stock was held by Martin Taylor and then by Fernando de la Guardia, as nominee, pending directions to transfer it to the purchasers thereof as sales of the petitioner's stock were made by Elizalde Co. to its stockholders and depositors. Elizalde Co. was the beneficial owner of substantially all of the stock of the petitioner during 1936 and 1937, and as sales of the stock were made from time to time to different depositors of the private bank which it operated, the proceeds thereof were retained by Elizalde Co. and stock certificates were issued to the purchasers. The first meeting of the stockholders of the petitioner was held in New York in December 1939. The stockholders who were not present in person sent their proxies to the president, Fernando de la Guardia. The only stockholders who *84 were residents of New York were the three officers of the petitioner, who were also the directors. These three stockholders did not have accounts with Elizalde Co. and paid in cash for the stock issued to them. Elizalde Co. had issued and outstanding voting common stock of a value of 3,850,000 pesos. The following schedule shows certain facts concerning the stockholders of both the petitioner and Elizalde Co.: Petitioner (1938-39)
Elizalde Co. (1936-39)
Preferred
Common Stock
Stock
Number
Per cent
Relation-
of
of
Amount
Per cent
Per cent
Stockholder's Name
ship *
Shares
Total
in Pesos
of Total
of Total
B. de la Guardia
2
.9009
F. de la Guardia
4
1.8018
Santiago Elizalde
Uncle
50
22.5225
1,000,000
25.9740
37.5
Fritz Von Kauffman, Sr.
**
30
13.5135
200,000
5.1948
3. Juan Elizalde
Brother
25
11.2613
300,000
7.7922
Dolores Teus Cornellana
5
2.2522
200,000
5.1948
7.3
Angel M. Elizalde
Brother
10
4.5045
Francisco Lopez
1
.4505
Prosper Verstockt
5
2.2522
*85 Petitioner (1938-39)
Elizalde Co. (1936-39)
Preferred
Common Stock
Stock
Number
Per cent
Relation-
of
of
Amount
Per cent
Per cent
Stockholder's Name
ship *
Shares
Total
in Pesos
of Total
of Total
Marie Elizalde Echogoyen
Cousin
2
.9009
200,000
5.1948
2. Jose Maria Elizalde
Echogoyen
Cousin
2
.9009
200,000
5.1948
2. Javier Elizalde Echogoyen
Cousin
2
.9009
200,000
5.1948
2. O. J. Gallagher
1
.4505
F. Von Kauffman, Jr.
***
1
.4505
Ernesto Von
Kauffman
***
1
.4505
Julia Jonick
1
.4505
Joaquin M. Elizalde
Brother
35
15.7657
500,000
12.9870
Manuel Elizalde
Brother
20
9.0090
200,000
5.1948
A. B. Park
10
4.5045
C. V. Starr
15
6.7567
Mrs. Joaquin J. Elizalde
Mother
500,000
12.9870
Fred Elizalde
Brother
150,000
3.8962
Mrs. Ignacio Jiminez
Sister
200,000
5.1948
Federico Elizalde
2. La Carlota
37.5
Concepcion Teus
.5
Joaquin Navascuez
.5
Encarnacion G. vda
de Teus
.5
Santiago Martinez
.5
Jose Ameztoy
.5
Basilio Ameztoy
.5
Pablo Martinez
.5
Fritz Von Kauffman
Provident Fund
1. Vda de A. J. Fenner
.2
Mercedes M. de Lopez
1.5
Emilio Diaz Moreau
.5
Total
222
100.0000
3,850,000
100.0000
100.0
*86 During the years 1936 to 1939, inclusive, all of the officers and directors of Elizalde Co. were residents of the Philippine Islands. The directors were J. M. Elizalde, Juan Elizalde, Manuel Elizalde, Fritz Von Kauffman and Prosper Verstocket. Between 1936 and 1938, J. J. Elizalde was chairman of the company, and Fritz Von Kauffman was vice-chairman; J. M. Elizalde was president and Juan Elizalde was vice-president. After the death of J. J. Elizalde in 1938, J. M. Elizalde became chairman; Juan Elizalde was thereafter president, and Manuel Elizalde was vice-president. During the taxable years the petitioner's purchases of sugar in the Philippine Islands were made under basic contracts with four corporations for which Elizalde Co. served as general manager, namely, Central Azucarera de la Carlota, Central Azucarera de Pilar, Central Sara-Ajuy, and Philippine Milling Company. As general manager Elizalde Co. made crop loans to these four corporations, purchased materials for them such as lime, sugar bags and spare parts, and arranged contracts of affreightment. Elizalde Co. *87 owned from 40 to 50 per cent of the stock of Carlota and was represented on the board of directors of that corporation. This was also true with respect to Pilar, in which the stock interest was about 30 per cent, and Sara-Ajuy, as to which the control was about 80 per cent. Elizalde Co. held no stock in the Philippine Milling Company but was represented by one or two directors. Most of the stock of that corporation is owned by the Archbishop of the Philippines. The above-mentioned basic contracts set forth the terms and conditions of the transactions whereby the petitioner undertook to purchase sugar in the Philippine Islands. The transactions were closed by the petitioner's cable or radioed offers and the seller's similarly communicated acceptances. Included in the conditions and stipulations set out in each contract are the following: "(a) The sugar covered by said offer and acceptance shall be Philippine trifugal sugar of the crop of the current year, entitled to free entry into the United States, unless otherwise indicated in said offer. "(b) Shipment of such sugar shall be made by the FIRST PARTY (the seller) from the Philippine Islands by such steamer as may be indicated *88 in said offer, or, if not so indicated, by such steamer as the FIRST PARTY may select, under contracts of affreightment to be arranged by the FIRST PARTY." These transactions were carried out in every case substantially as follows: "(a) The Taxpayer cabled to Elizalde Co. as general manager, * * *, and offered to purchase from Carlota, Pilar, Sara-Ajuy or the Philippine Milling Company a specified amount of sugar at a stated price f.o.b. Philippine Islands. The Taxpayer had the right to indicate in the offer the steamer by which the shipment should be made. "(b) If the Taxpayer knew a particular ship was scheduled to arrive in the United States at the right time for the resale of the sugar, the ship was generally named in the cabled offer. "(c) Elizalde Co. as such general manager accepted such offer. "(d) All arrangements for the shipment of the sugar, including the contracts of affreightment, were made by the seller through Elialde Co. as general manager. "(e) When the sugar was received in the United States and the bill of lading forwarded by the agent of the steamship company, the Taxpayer paid the freight and the purchase price agreed upon. "(f) It was specified *89 that the freight was payable at the destination and that the 'conference rate' would apply to the shipment. The freight was payable by the Taxpayer." The freight paid by the petitioner on all shipments of sugar made to it in the taxable years was at the Pacific Conference rate, a uniform rate established from time to time by an association of steamship companies operating in the Pacific Ocean. All of the major steamship companies maintaining regular schedules between the Philippine Islands and the United States belonged to the Pacific Conference. All sugar purchased by the petitioner in the Philippine Islands in 1936, 1937 and 1938 was shipped to the United States by the Mitsui Line. Beginning in 1939 some of the sugar was shipped over other lines. Elizalde Co. was the exclusive sub-agent for Mitsui in Iloilo from about 1930 to and including 1939. In such capacity, Elizalde Co. maintained a shipping department in Iloilo with sufficient personnel to take charge of the arrival and dispatch of the ships carrying the petitioner's sugar. Elizalde Co. made all arrangements for berthing the vessels, pilotage and stevedoring, loading supplies and freight, clearing with the customs, obtaining *90 the necessary papers for the crew and officers and securing lading permits and other necessary papers. For such services, as sub-agent for Mitsui, Elizalde Co. received a commission of 7 1/2 per cent on the amount of freight paid on sugar shipments. As such sub-agent for Mitsui, Elizalde Co. not only shipped sugar on that line but also shipped other commodities for which it received varying commissions. During the years 1936 to 1939, inclusive, the petitioner purchased between $12,000,000 and $14,000,000 worth of sugar in the Philippine Islands through Elizalde & Co., Inc. The freight charges on sugar were approximately 10 per cent of the value of the sugar. Mitsui paid Elizalde & Co., Inc., about 7 1/2 per cent of the amount of the freight charges for services rendered as sub-agents by Elizalde & Co., Inc., for Mitsui. The amounts of money added by the Commissioner to the petitioner's income for the four years, as above set forth, were paid by Mitsui to Elizalde & Co., Inc., for commissions for the services rendered by it as sub-agents for Mitsui. Opinion Section 45 of the Revenue Act of 1936 [1] (similar, in all material respects, to section 45 of the Revenue Act of 1938 and *91 section 45 of the Internal Revenue Code), set forth in the margin, authorizes the respondent to distribute, apportion, or allocate gross income between or among organizations, trades, or businesses that are owned or controlled directly or indirectly by the same interests, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly reflect income. Invoking the authority conferred by this section, the respondent has determined that it is necessary to include certain income in the income of the petitioner in order to clearly reflect its income and prevent the evasion of taxes. The following language from Briggs-Killian Co., 40 B.T.A. 895, 898, is a concise statement of the legislative purpose of section 45: "The legislative purpose of section 45 was to prevent the avoidance of taxes or the distortion of income by the shifting of profits from one business to another. Asiatic Petroleum Co. v. Commissioner, 79 Fed. (2d) 234, 237, affirming 31 B.T.A. 1152; certiorari denied, 296 U.S. 645. To accomplish this purpose the Congress vested broad *92 discretionary powers in the respondent. Where, as here, the respondent has exercised his discretion, the burden is placed upon the petitioner of showing that respondent's determination is arbitrary and that he has abused the authority vested in him. Welworth Realty Co., 40 B.T.A. 97, 100; Connery Coal & Investment Co v Commissioner, 84 Fed. (2d) 485; Nowland Realty Co. v. Commissioner, 47 Fed. (2d) 1018." Petitioner has attempted to meet its burden by showing that it is not *93 a controlled corporation within the meaning of section 45; that it has not evaded any tax; that the allocation to it of the commissions earned by Elizalde Co., for its services as subagent for Mitsui, is not necessary to clearly reflect its income; that no income was received or collected or was capable of being received or collected by it in respect of such commissions; and the claimed additional income allocated by the Commissioner is not shown to have been the commissions received by Elizalde Co. as sub-agent of Mitsui in respect of sugar shipments to the petitioner. In disposing of this question we consider it unnecessary to decide whether the petitioner is controlled by Elizalde Co., so as to make applicable section 45, for, on the facts, we have concluded that there is here no income properly allocable to the petitioner in order to clearly reflect its income or prevent the evasion of taxes. On brief, as to this proposition, the respondent's position is "that the controverted payments were made by Mitsui to Elizalde Co. as a result of that corporation's agreement to use the Mitsui Line exclusively for shipping sugar to the United States; that such payments constituted rebates *94 or 'kickbacks' on freight charges paid by the petitioner at the conference rate, under all the circumstances here present, and that they were properly added to the petitioner's reported income for the taxable years under the provisions of section 45." However, J. M. Elizalde, chairman of Elizalde Co., testified unequivocally that Elizalde Co. was the exclusive sub-agent for Mitsui and in such position performed certain tasks and was paid by a commission on the amount of freight it directed over the Mitsui line. No facts or circumstances were developed on cross-examination, or otherwise, which refuted or weakened this testimony. We conclude and hold that the disputed amounts were earnings for services rendered, not rebates. The fact that the petitioner paid the Pacific Conference rate on all sugar shipped from the Philippine Islands and that the so-called "Pacific Conference rate" was maintained by many large steamship lines does not in any way weaken the petitioner's position in this case. Steamship companies may make rebates, but in light of the evidence before us we can not hold that Mitsui made or was obligated to make rebates to the petitioner. It was merely paying for an agent's *95 services. The evidence is positive and uncontradicted that any monies paid by Mitsui to Elizalde & Co., Inc., were paid "for commissions to the sub-agents for the steamship company." This evidence alone does not show how much the commissions were. However, there was placed in evidence a Cargo Policy and other shipping papers involving a shipment through Elizalde & Co., Inc., as general managers and Mitsui as carriers showing that the freights were, roughly speaking, about 10 per cent of the value of the sugar. These seem to be representative. Therefore, based upon a value of $12,000,000 to $14,000,000 for sugar shipped through Elizalde & Co., Inc., to the petitioner freights would be approximately $1,200,000 to $1,400,000, and 7 1/2 per cent thereof is not greatly less than the amounts added by the Commissioner to petitioner's income during the four years. The deficiency notice indicates that the entire amount received by Elizalde & Co., Inc., from the carriers was added to petitioner's income. Though the total amounts added by the Commissioner to petitioner's income do amount to somewhat more than the commissions as explained by the petitioner's evidence, we think it would be unreasonable *96 to consider that such discrepancy amounts to a failure of proof in this case, most particularly since the Commissioner on brief states its position to be as above stated and, in effect, makes the issue one whether the payments by Mitsui to Elizalde & Co., Inc., were rebates. This the petitioner meets by showing, in substance, that the payments were for services rendered. We, therefore, think the petitioner met its burden. If, as the evidence shows, Elizalde & Co., Inc., received the amounts involved for services they were not rebates and no reason appears to ascribe them to the petitioner here. Decision will be entered under Rule 50. Footnotes
*. The same language, except for amounts and designation of statute (Section 45 of Revenue Act of 1938 for the year of 1938 and section 45 of Internal Revenue Code↩ for 1939), is contained in the deficiency notice in regard to the other three years.
*. Relationship to the "brother" unless otherwise indicated. ↩
**. Joaquin M. Elizalde's father-in-law.↩
*. Relationship to the "brother" unless otherwise indicated. ↩
***. Sons of Fritz Von Kauffman, Sr.↩
1. SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩